IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| RON FEHR, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. |
| | § | |
| JOHN HENNESSEY d/b/a | § | |
| HENNESSEY PERFORMANCE and | § | |
| HPE DESIGN LLC, | § | |
| | § | |
| Defendants. | § | |

## RON FEHR'S ORIGINAL COMPLAINT

Plaintiff Ron Fehr files this Complaint against Defendants John Hennessey d/b/a Hennessey Performance and HPE Design LLC[1] (collectively, referred to herein as "**Hennessey**") to recover monetary damages for Hennessey's breaches of contracts, breaches of warranties, violations of the Texas Deceptive Trade Practices Act, and fraudulent inducement. In support of this Complaint, Mr. Fehr respectfully shows the Court as follows:

## NATURE OF ACTION

Mr. Fehr contracted with Hennessey for Hennessey to turbocharge Mr. Fehr's new Ferrari 458 Spider. The upgrade did not work and rendered the car inoperable. After Mr. Fehr gave Hennessey several lengthy attempts to repair the turbocharged Ferrari 458 Spider—which all failed—Mr. Fehr simply asked Hennessey to return his automobile to its stock condition and to refund his money. Hennessey could not return the Ferrari 458 Spider to its stock condition, but agreed to pay Ferrari of Houston ("**FoH**") to do the work, and to refund Mr. Fehr's money. After

---

[1] Mr. Fehr has never conducted business with HPE Design LLC, but on information, Hennessey Performance may be the assumed name of HPE Design. As of this filing Mr. Fehr has not confirmed this and alleges that he interacted with John Hennessey and his agents doing business as Hennessey Performance.

1

FoH began the repair work, Hennessey refused to pay most of the money owed to FoH and refused to refund Mr. Fehr's money.  Mr. Fehr is now forced to sue Hennessey to recover the money he spent upgrading his car and the money owed to FoH.  Therefore, Mr. Fehr makes alternative claims for breach of contract, breach of warranties, violations of the Texas Deceptive Trade Practices Act, and fraudulent inducement.

## JURISDICTION

1.Jurisdiction is proper in this court under 28 U.S.C. § 1332(a) because, as discussed below, Ron Fehr and Hennessey are diverse for purposes of citizenship and Mr. Fehr seeks relief in excess of $75,000.

2.This Court has personal jurisdiction over Hennessey because he is a resident in the Southern District of Texas and the Houston Division and conducts business in Texas.

## VENUE

3.Venue is proper in this district under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims arose within this district.

## PARTIES

4.Plaintiff Mr. Fehr is an individual and a citizen of Canada.  Mr. Fehr has standing and capacity to file this suit and believes that the Defendant is being sued in his correct capacity.

5.Upon information and belief, Defendant John Hennessey is an individual and is a resident citizen of Austin County, Texas.  Upon information and belief, John Hennessey operates Hennessey Performance as a sole proprietorship with a principle place of business in Austin County, Texas at 9821 Interstate 10 Frontage Road, Sealy, Texas 77474.  Hennessey is represented by counsel, Gwyneth Campbell, Chappoton Sanders Scarborough, 2 Riverway, Suite 1500,

2

Houston, Texas 77056.  Mr. Fehr believes that service may be accomplished at Hennessey's place of business or through his counsel.

6. HPE Design LLC is an entity registered to do business in Texas and is a resident of Austin County, Texas. Mr. Fehr believes that service may be accomplished upon HPE Design LLC through its registered agent, Gwyneth Campbell, Chappoton Sanders Scarborough, 2 Riverway, Suite 1500, Houston, Texas 77056.  If HPE Design LLC is properly registered to do business as Hennessey Performance then HPE Design LLC is a proper defendant.

## FACTUAL BACKGROUND

7. Mr. Ron Fehr is a businessman who lives in Alberta, Canada. After years of success with his business, Mr. Fehr chose to treat himself and his wife with the purchase of a new Ferrari 458 Spider automobile.

8. To really enjoy the experience of driving the Ferrari 458 Spider with his wife, Mr. Fehr decided to hire Hennessey to increase the performance of the Ferrari 458 Spider. Mr. Fehr was informed that Hennessey could provide these services.  In fact, Hennessey holds itself out as a business that "has been making cars go faster since 1991" and "offers a wide variety of dyno proven, track test parts and upgrades for a variety of modern performance vehicles." Hennessey boasts a "30,000 square foot workshop and showroom facility situated on 143 acres near Sealy, Texas" and "a showroom and installation facility located in Lake Forest, California." Mr. Fehr found Hennessey's representation on the internet and decided to enlist Hennessey's services to upgrade his Ferrari 458 Spider.

9. Relying on Hennessey's professed expertise, Mr. Fehr agreed that he would pay Hennessey $50,000 to provide the necessary goods and services to Mr. Fehr's Ferrari 458 Spider to

install turbochargers to increase the power output of Mr. Fehr's Ferrari 458 Spider to 700 horsepower.  Hennessey also warranted the goods and services he provided for 12 months.  Mr. Fehr relied on those promises and they became the basis of the bargain between Hennessey and Mr. Fehr.  In entering the agreement with Hennessey, Mr. Fehr notified Hennessey on how he would use the Ferrari 458 Spider.  Relying on Hennessey's experience with performance vehicles, Mr. Fehr drove his car to ZR Auto in Alberta Canada, which shipped his car to Hennessey in Sealy, Texas and paid Hennessey $50,000.

10. Hennessey worked on the Ferrari 458 Spider for five months even though he promised that the work would only take four months.  Hennessey finally completed its work and shipped the Ferrari 458 Spider back to Mr. Fehr in Alberta, Canada.  After receiving the modified Ferrari 458 Spider, the engine light came on after only ten days of driving.

11. Mr. Fehr sent the car back to Houston for repairs. Hennessey purportedly repaired the Ferrari 458 Spider and sent it back to Mr. Fehr in Canada.  After driving the car for approximately one month, the engine light came on again, indicating a problem with the turbochargers installed by Hennessey.  Mr. Fehr sent the car to ZR Auto where Hennessey sent an employee to attempt to repair the Ferrari 458 Spider.  After two weeks of purported repairs, Mr. Fehr received the car back from Hennessey's employee.

12. After approximately one month the turbochargers failed. Again, Hennessey directed the repairs and the replacement of the turbochargers.  A month after receiving car back, the Ferrari 458 Spider suffered from complete engine failure.

13. After this failure, Hennessey told Mr. Fehr to ship the car to Hennessey's California workshop.  Hennessey represented that that workshop had more experience with

4

"exotic cars." Mr. Fehr did and Hennessey once again worked on Mr. Fehr's car. Initially, Mr. Fehr wanted Hennessey to return the Ferrari 458 Spider to "stock"—the original condition that Mr. Fehr purchased the car; however, Hennessey persuaded Mr. Fehr for the opportunity to fix the car with turbochargers in exchange for a new one year warranty from Hennessey. Mr. Fehr agreed and accepted the new extended warranty.

14. After five months, Hennessey shipped the car to Mr. Fehr's vacation home in Phoenix, Arizona. Once again the turbochargers failed. However, this time the engine broke down and emitted blue smoke on acceleration and de-acceleration.

15. After the last failure, Mr. Fehr simply asked that Hennessey return the Ferrari 458 Spider to its stock condition. Hennessey agreed to do this, but stated that he would do this at his Texas facility because he was shutting down his California operations. Mr. Fehr reluctantly agreed to have the Ferrari 458 Spider shipped to Hennessey's Texas facility.

16. Hennessey apologized to Mr. Fehr and agreed to return the Ferrari 458 Spider to its stock condition once it arrived in Texas. Once at Hennessey's Texas facility, the Ferrari 458 Spider sat idly for weeks. Mr. Fehr constantly asked for updates. To spur action from Hennessey, Mr. Fehr threatened legal action against Hennessey. To dissuade Mr. Fehr from taking legal action against Hennessey, Hennessey promised that he would pay for all the repairs to return the Ferrari 448 Spider to stock and would also refund previous payments made by Mr. Fehr.

17. Ultimately Hennessey determined that he could not return Mr. Fehr's Ferrari 458 Spider to stock and instead sent Mr. Fehr's car to FoH. To forestall any legal action against Hennessey, Hennessey promised that he would pay for the repairs conducted by FoH in returning Mr. Fehr's car to stock and would also refund Mr. Fehr his money. Mr. Fehr accepted Hennessy's

promise and agreed that he would not sue Hennessey if Hennessey paid for all of the repairs performed by FoH on the Ferrari 458 Spider and Hennessey refunded Mr. Fehr's money (the "**Final Agreement**").

18. Hennessey made initial payments under the Final Agreement–paying $20,000 to FoH and $40,000 to Mr. Fehr–but ceased making additional payments and ceased providing updates on the status of Mr. Fehr's Ferrari 458 Spider.  As time went on, Mr. Fehr became increasingly distressed about the status of his vehicle as he received neither the promised updates nor the additional refund payments.  Again, Mr. Fehr threatened legal action and again Hennessey reaffirmed the Final Agreement to assuage Mr. Fehr.

19. As late as April and June 2016, Hennessey and people acting on Hennessey's behalf have made numerous assurances that Hennessey would resolve the outstanding monetary issues under the Final Agreement. Hennessey has failed to do this.  As a consequence, Mr. Fehr's car remains unrepaired and Mr. Fehr has not been made financially whole. Mr. Fehr has lost money, time to enjoy his Ferrari 458 Spider, and value due to depreciation in the car.  Moreover, the car still remains unrepaired.  Finally, if Hennessey refuses to pay FoH, FoH will have a mechanic's lien on Mr. Fehr's Ferrari 458 Spider, leaving Mr. Fehr with additional expenses.

20. It has now become evident that Hennessey's entrance into the Final Agreement with Mr. Fehr was nothing more than a lie by Hennessey to induce Mr. Fehr to forego his legal claims.  Hennessey represented that he would perform the obligations above in the Final Agreement with Mr. Fehr, but it has become clear that Hennessey had no intention of performing his obligations upon entering the Final Agreement with Mr. Fehr.  If Hennessey somehow did not intentionally deceive Mr. Fehr, he acted recklessly in making representations to Mr. Fehr that he

did not have the means to perform. Mr. Fehr relied to his detriment in trusting that Hennessey would perform his obligations under the agreement to pay for the repairs and repay the money owed to Mr. Fehr and is now exposed to liability to third parties, has not received full payment from Hennessey, and still does not have a working Ferrari 458 Spider.

21. Accordingly, Mr. Fehr seeks the relief below.

## CAUSES OF ACTION

### Count 1: Breach of Contract

22. Mr. Fehr incorporates all of the allegations above by reference as if fully set forth herein.

23. Mr. Fehr and Hennessey are parties to the Final Agreement, which is a valid, enforceable contract, whereby Hennessey agreed to return Mr. Fehr's car to stock by paying FoH to do so. In doing so, Mr. Fehr agreed to cover the cost of parts and labor at FoH. In relying on Hennessey's promises, Mr. Fehr performed by allowing his car to be delivered to FoH. To date, $80,000-$100,000 remains outstanding to FoH. Additionally Hennessey promised to refund Mr. Fehr $50,000. To date, $10,000 remains outstanding.

24. Mr. Fehr has performed all of his obligations under the Final Agreement, and all conditions precedent have been met.

25. Hennessey has failed to perform its obligations under the Final Agreement by failing to return Mr. Fehr's automobile to stock by paying FoH to return Mr. Fehr's Ferrari 458 Spider to stock and by refusing to pay the remaining money Hennessey agreed to pay to Mr. Fehr.

26. Accordingly, Hennessey has materially breached the Final Agreement.

27. As a proximate result of Hennessey's breach of contract, Mr. Fehr sustained the following damages:

7

  (1)  Approximately $80,000-$100,000 in third-party repair costs to return Mr. Fehr's Ferrari 458 Spider to stock;

  (2)  $10,000 in payments to Hennessey and others; and

  (3)  Depreciation of Mr. Fehr's Ferrari 458 Spider while not being able to reliably use the Ferrari 458 Spider for over a year.

**Count 2: Deceptive Trade Practice Act (DTPA)—Breach of Warranties and Deceptive Act**

27. Mr. Fehr incorporates all of the allegations above by reference as if fully set forth herein.

28. Mr. Fehr is a consumer under the DTPA because Mr. Fehr is an individual who sought and acquired services by purchase.

29. Hennessey is an individual and can be sued under the DTPA.

30. Hennessey violated the DTPA when Hennessey breached express and implied warranties. Specifically, Hennessey and Mr. Fehr agreed that Hennessey would add turbochargers to Mr. Fehr's Ferrari 458 Spider that would work reliably.

31. Hennessey expressly warranted that Mr. Fehr's Ferrari 458 Spider would be turbocharged and able to achieve 700 horsepower and would work reliably for at least one year. These representations became part of the basis of the bargain. Hennessey also engaged in a deceptive act, by providing false, misleading, and deceptive practices in advertising that he could turbocharge Mr. Fehr's Ferrari 458 Spider when he could not. Mr. Fehr relied on Hennessey's false, misleading, or deceptive statements, and they caused his injuries.

32. Hennessey also impliedly warranted that the turbocharged Ferrari 458 Spider would work for Mr. Fehr's purpose and that the turbochargers would be free from defects.

33. Mr. Fehr gave notice to Hennessey as required by Texas Business & Commerce Code section 17.505(a).

8

34.     Mr. Fehr's turbocharged Ferrari 458 Spider was not as warranted as it was not free from defects and did not run for one year.

35.     When Mr. Fehr notified Mr. Hennessey of these deficiencies, Hennessey asked and received multiple opportunities to cure.  Ultimately, Hennessey could not make Mr. Fehr's Ferrari 458 Spider perform as warranted.

36.     Hennessey then sought to dissuade Mr. Fehr from filing a Deceptive Trade Practices Claim against Hennessey, by making promises that Hennessey had no intention of keeping.

37.      Accordingly, Hennessey has breached express and implied warranties and has compounded its breach by engaging in further deceptive conduct.

38.     Hennessey's wrongful conduct was a producing cause of Mr. Fehr's injury, which resulted in the following damages:

(1)     $80,000-$100,000 in third-party repair costs to return Mr. Fehr's Ferrari 458 Spider to stock;

(2)     $10,000 in payments to Hennessey;

(3)     Depreciation of Mr. Fehr's Ferrari 458 Spider while not being able to reliably use the Ferrari 458 Spider for over a year; and

(4)     Incidental damages.

39.     Mr. Fehr suffered mental anguish and Hennessey acted intentionally to deceive Mr. Fehr and to deprive him of use of his automobile, which entitles Mr. Fehr to recover treble damages under Texas Business & Commerce Code section 17.50(b)(1).

## Count 3: Breach of Express Warranty

40.     Mr. Fehr incorporates all of the allegations above by reference as if fully set forth herein.

41. Mr. Fehr contracted with Hennessey for Hennessey to provide goods and services to turbocharge Mr. Fehr's Ferrari 458 Spider.

42. Hennessey expressly warranted that the turbocharged Ferrari 458 Spider would be suitable for driving and would perform for at least one year. These representations became part of the basis of the bargain.

43. Mr. Fehr's Ferrari 458 Spider does not perform as warranted by Hennessey.

44. Mr. Fehr would show that within a reasonable time after discovery of the defects in his Ferrari 458 Spider, Mr. Fehr gave notice of the breach of warranty to Hennessey. Despite having been promptly notified of the defects and resulting breach of warranty, Hennessey has not cured or otherwise satisfied Mr. Fehr's complaints and objections. In addition, Mr. Fehr has performed all conditions precedent to recover for breach of warranty.

45. Mr. Fehr's turbocharged Ferrari 458 Spider would have had a fair market value in Harris County of $400,000 at the time Mr. Fehr entered into the initial agreement with Hennessey had it been in the condition warranted by Hennessey. As a proximate result of Hennessey's breach of express warranties, Mr. Fehr sustained the following damages:

(1) The loss in market value of the Ferrari 458 Spider;

(2) $80,000-$100,000 in third-party repair costs to return Mr. Fehr's Ferrari 458 Spider to stock;

(3) $10,000 in payments to Hennessey;

(4) Depreciation of Mr. Fehr's Ferrari 458 Spider while not being able to reliably use the Ferrari 458 Spider for over a year; and

(5) Incidental costs.

## Count 4: Breach of Implied Warranties

46. Mr. Fehr incorporates all of the allegations above by reference as if fully set forth herein.

47. Mr. Fehr purchased goods and services from Hennessey to turbocharge Mr. Fehr's automobile.

48. When Mr. Fehr purchased services from Hennessey, Hennessey was a dealer in automobile upgrades of the type of the goods and services provided to Mr. Fehr's automobile. At all times material to this action, Hennessey held itself out to the public as having knowledge or skill peculiar to the business of upgrading automobiles. Accordingly, under Section 2.314 of the Texas Business and Commerce Code, Hennessey, as a merchant, impliedly warranted that the turbochargers would be merchantable. Specifically, Hennessey warranted that the turbochargers were reasonably fit for the ordinary purpose for which they were to be used and would pass without objection in the trade.

49. The turbochargers were not fit for the ordinary purpose for which they were intended to be used and would not pass without objection in the trade.

50. Before and at the time of Hennessey's sale of the goods and services to Mr. Fehr, as described above, Hennessey knew or had reason to know that Mr. Fehr purchased these goods and services for the purpose of having an upgraded fully functional automobile for driving. Hennessey knew or had reason to know of this intended particular purpose because Mr. Fehr fully described the Ferrari 458 Spider's intended use and because of Hennessey's extensive history with the automobile industry. As a result, Hennessey further knew or had reason to know that Mr. Fehr was relying on Hennessey's skill and judgment to furnish goods and services that would be suitable for the intended purpose. Consequently, under the provisions of Section 2.315 of the Texas

Business and Commerce Code, Hennessey warranted the upgraded Ferrari 458 Spider as fit for Mr. Fehr's particular purpose.

51. At the time Hennessey provided services to Mr. Fehr's Ferrari 458 Spider and at all subsequent times, the services were not as warranted, but were unfit for the particular purpose for which they were intended. Specifically, the Ferrari 458 Spider is defective because it is inoperable.

52. Mr. Fehr would show that within a reasonable time after discovery of the defects in the turbocharged Ferrari 458 Spider, Mr. Fehr gave notice of the breach of warranty to Hennessey. Despite having been promptly notified of the defects and resulting breach of warranty, Hennessey has not cured or otherwise satisfied Mr. Fehr's complaints and objections. In addition, Mr. Fehr has performed all conditions precedent to recovery for breach of warranty.

53. Mr. Fehr's turbocharged Ferrari 458 Spider would have had a fair market value in Harris County of approximately $400,000 at the time Mr. Fehr entered into the initial agreement with Hennessey had it been in the condition warranted by Hennessey. As a proximate result of Hennessey's breach of express warranties, Mr. Fehr sustained the following damages:

(1) The loss in market value of the Ferrari 458 Spider;

(2) $100,000 in third-party repair costs to return Mr. Fehr's Ferrari 458 Spider to stock;

(3) $10,000 in payments to Hennessey;

(4) Depreciation of Mr. Fehr's Ferrari 458 Spider while not being able to reliably use the Ferrari 458 Spider for over a year; and

(5) Incidental costs.

### Count 5: Fraudulent Inducement

54. Mr. Fehr incorporates all of the allegations above by reference as if fully set forth herein.

55. Hennessey entered into the aforementioned Final Agreement with Mr. Fehr and made representations that he would perform his obligations under the agreement. Those representations were material as they were the sole purpose of the Final Agreement.

56. Hennessey had no intention of performing the Final Agreement when he entered into the agreement; he only wanted to dissuade Mr. Fehr from exercising certain legal rights against Hennessey. Alternatively, in attempting to dissuade Mr. Fehr from exercising certain legal rights against Hennessey, Hennessey acted recklessly in making representations that he knew or should have known he could not perform

57. Mr. Fehr relied to his detriment in trusting that Hennessey would perform his obligations under the Final Agreement to pay for the repairs and repay the money owed to Mr. Fehr and is now exposed to liability to third parties, has not received full payment from Hennessey, and still does not have a working Ferrari 458 Spider.

58. As a proximate result of Hennessey's misrepresentations, Mr. Fehr sustained the following damages benefit-of-the bargain, out-of-pocket, consequential, and incidental damages.

### III. Attorneys' Fees

59. Mr. Fehr has employed the undersigned attorneys to prosecute this suit on its behalf. Mr. Fehr is entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practice & Remedies Code Section 17.50(d) because this is a suit under the DTPA.

60. Mr. Fehr is also entitled to recover reasonable and necessary attorneys' fees under Texas Civil Practice & Remedies Code Section 38.001(8) because this is a suit for breach of express warranties. Mr. Fehr presented its claim to Hennessey and on numerous occasions thereafter. Hennessey did not tender the amount owed within 30 days after the claim was repeatedly presented.

61. Mr. Fehr is also entitled to recover attorneys' fees under his claim for fraudulent inducement.

## IV. Conditions Precedent

62. All conditions precedent to Mr. Fehr's claim for relief have been performed or have occurred.

## V. Prayer for Relief

For the reasons stated, Mr. Fehr prays for judgment against Hennessey, including the following relief:

(1) issue citations so that Mr. Fehr may have Hennessey served with process;

(2) award Mr. Fehr monetary damages to which he is entitled in excess of the minimum jurisdictional limits of the Court;

(3) award Mr. Fehr pre-judgment and post-judgment interest at the maximum legal rate allowable on all sums awarded as actual damages;

(4) award Mr. Fehr reasonable attorneys' fees and court costs; and

(5) award Mr. Fehr any other relief, at law or in equity, to which he may be justly entitled.

Respectfully submitted,

*/s/ James Lloyd Loftis*
James Lloyd Loftis
Texas Bar No. 12491210
Federal Bar No. 29739
Quentin L. Smith
Texas Bar No. 24075096
Federal Bar No. 1475203
VINSON & ELKINS, LLP
1001 Fannin Street, Suite 2500
Houston, TX  77002-6760
Tel. 713.758.1024
Fax 713.615.5143
jloftis@velaw.com
qsmith@velaw.com

**ATTORNEYS FOR PLAINTIFF RON FEHR**